

~~SEALED~~
s/ dominicfrank

FILED
Jun 12 2024
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY     s/ GloriaVocal     DEPUTY

ORDERED UNSEALED on 06/20/2024   s/ dominicfra

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

November 2023 Grand Jury

UNITED STATES OF AMERICA,

    v.

CINDY JUSTICE (1),
ASHLEIGH DAVIS (2),

    Defendants.

Case No. '24 CR1229 LL

I N D I C T M E N T

Title 18, U.S.C., Sec. 371 – Conspiracy to Commit Health Care Fraud and Pay Unlawful Remunerations; Title 18, U.S.C., Title 1347 – Health Care Fraud; Title 42, U.S.C., Sec. 1320a-7b(b)(2) – Payment of Illegal Remunerations; Title 18, U.S.C., Sec. 982(a)(7) – Criminal Forfeiture

The grand jury charges, at all times material:

INTRODUCTORY ALLEGATIONS

1. The Medicare program ("Medicare") was established under Title XVIII of the Social Security Act. Medicare was a federal health care program providing benefits to persons who are sixty-five years of age or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who receive benefits under Medicare were referred to as Medicare "beneficiaries." Medicare was a health care benefit program as defined by 18 U.S.C. § 24(b).

VHC:nlv(2):San Diego:6/12/24

2. Medicare had four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part D provided coverage for the cost of prescription drugs for individuals on Medicare. Part D coverage was managed by pharmacy benefit managers (PBMs) and other private companies approved by Medicare.

3. Pacifico West Rx Inc., dba PureScience Rx ("PureScience Rx") was a pharmacy located at 15644 Pomerado Road, Unit 303, Poway, CA 92064. On or about October 20, 2016, the California State Board of Pharmacy issued pharmacy license number 54618 to PureScience Rx. PureScience RX's President was Cindy JUSTICE. According to its website as of April 2023, "PureScience Rx is a compounding pharmacy that offers customized medications that are not readily manufactured."

4. Cindy JUSTICE was the owner and president of PureScience Rx. JUSTICE also co-owned Pacifico National II INC, dba Amex Pharma Lab, located at 1515 Elizabeth Street, Suite J, Melbourne, FL 32901.

5. Ashleigh DAVIS was the Operations Manager at PureScience Rx. She was also a licensed Pharmacy Technician in the state of California.

6. Diflorasone diacetate was a high-potency topical steroid that should be used sparingly. 240 grams for 30 days (8 grams a day) would be enough to cover the entire trunk (front and back) and more twice a day.

7. Gentamicin sulfate 0.1% was an antibiotic ointment or cream for topical application that treats primary and secondary bacterial infections of the skin. A small quantity of this drug was typically applied to lesions on the skin three or four times a day. A supply of 900 grams (30 grams each day) would be sufficient to cover the entire trunk (front and back) eight times per day.

8.  Daptomycin 500 mg for IV solution was an antibiotic used for bloodstream infections and complicated skin infections, and is administered by intravenous infusion. Intravenous treatment should be used for 7-14 days for complicated skin infections. A 30-day supply would exceed the recommended length of therapy. In typical clinical practice, injectable anti-infective drugs such as daptomycin IV would not be dispensed to patients for use at home, but would be given in a hospital or other medical facility.

9.  Vancomycin hydrochloride was an oral antibiotic typically used to treat infection in the small and large intestines caused by *C. Difficil* bacteria. The capsules should be taken three or four times a day for 7-10 days. There were no clinical studies showing that this antibiotic would be effective dissolved in water for absorption through the skin. A 30-day supply would exceed the recommended length of therapy.

**Count 1**
Conspiracy to Commit Health Care Fraud and Pay Unlawful Remuneration
18 U.S.C. § 371

10.  Paragraphs 1 through 9 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

11.  Starting no later than in or around 2018 and continuing through at least August 2020, within the Southern District of California, and elsewhere, defendants CINDY JUSTICE and ASHLEIGH DAVIS conspired with each other and with others to knowingly, willfully, and intentionally agree to commit the following offenses against the United States:

    a.  To knowingly and willfully, with the intent to defraud, execute a material scheme to defraud Medicare, a health care benefit program affecting commerce, as defined in

1  18 U.S.C. § 24(b), and to obtain, by means of materially
2  false and fraudulent pretenses, representations,
3  promises, and omissions and concealments of material
4  facts, money and property owned by, and under the custody
5  and control of, Medicare, in connection with the delivery
6  of and payment for health care benefits, items, and
7  services, in violation of 18 U.S.C. § 1347; and
8     b.  To knowingly, willfully, and intentionally pay
9  remuneration directly and indirectly, overtly and
10  covertly, in cash and in kind, to induce persons to refer
11  individuals to PureScience RX for the furnishing and
12  arranging for the furnishing of compound prescriptions,
13  payment for which was made in whole and in part under a
14  federal health care program, namely, Medicare, in
15  violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and (B).

<u>Purpose of the Conspiracy</u>

12. It was the object of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by paying kickbacks for referrals of Medicare beneficiaries, then submitting fraudulent claims to Medicare, a federal health care benefit program, for medically unnecessary – but exorbitantly priced – medications.

<u>Manner and Means of the Conspiracy</u>

13. The manners and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included the following:

   a. Defendants entered into agreements with so-called "marketing companies" to pay kickbacks for the referral of Medicare beneficiaries to PureScience RX.

4

b. The marketing companies, in turn, identified Medicare beneficiaries to target for expensive drugs. These drugs typically included medications prescribed in connection with a "foot bath" scheme, such as Diflorasone diacetate, Gentamicin sulfate, and Vancomycin Hydrochloride.

c. The beneficiaries whom the marketers identified were referred to as "leads." The marketers received beneficiary information from various sources, including overseas call centers, and the information usually included the Beneficiary's personal and health insurance information.

d. After identifying leads, the marketers called the beneficiaries to pressure them to agree to try expensive medications-regardless of medical necessity.

e. Defendants worked with the marketing companies to create prescription pads, which contained specific medications for a physician to choose from. The prescription pads almost exclusively contained medications that reliably generated high reimbursements.

f. To establish and determine which medications would be placed on the prescription pads, defendants submitted false claims to health care benefit programs through a practice known as submitting "test claims." The purpose of "test claims" was to determine how much a health care benefit program would reimburse for a particular formula or medication. This way, the pharmacies and marketing companies could include on their prescription pads medications that would result in high reimbursements from

5

    Medicare. For PureScience Rx, JUSTICE knew about and approved of this practice, and DAVIS carried it out.

  g. As a result of submitting "test claims" and other methods, defendants created prescription pads containing particular medications. Defendants were aware that medications were placed on the prescription pads based on what would yield the most expensive reimbursements, and not on the medical or health needs of any particular patient.

  h. After the beneficiary agreed to receive the medication, the marketing companies transmitted the beneficiaries' medical information and portions of the telemarketing phone calls to telemedicine companies with which the marketing companies had financial agreements. The marketers also sent to the telemedicine companies the pre-marked prescription pads requested by the pharmacies, that would yield exorbitant reimbursements.

  i. The telemedicine companies thereafter paid doctors and other health care providers to approve the pre-written prescriptions that they had received from the marketing companies. The doctors often approved the prescriptions without having had any contact with the beneficiaries and without making a bona fide assessment that the medications were medically necessary.

  j. After securing signed prescriptions, typically using the premarked prescription pads prepared by the pharmacies and marketing companies, the marketing companies steered the prescriptions to the pharmacy.

|    |     |                                                                                                          |
|----|-----|----------------------------------------------------------------------------------------------------------|
| 1  | k.  | The pharmacy then sought to fill and dispense the medications, and submitted claims for reimbursement to health care benefit programs. |
| 4  | l.  | The pharmacy's claims were for reimbursement were false and fraudulent for reasons including: they were based on prescriptions signed by physicians who lacked a legitimate doctor/patient relationship with the beneficiary; the prescription was signed by a physician who was paid a kickback to sign it; the physician did not examine, and in most cases did not speak to the patient and could not have determined whether the treatment was medically necessary; the physician did not choose the custom medications to be compounded but was given only a preprinted prescription pad; and the pharmacy paid a kickback to others for the referral of that patient. |
| 16 | m.  | Once the pharmacy received reimbursement, defendants paid a 50% kickback to the marketing companies as payment for the prescriptions that the marketers had paid the telemedicine companies to generate. |
| 20 | n.  | Because it was unlawful for the pharmacy to pay the marketing companies kickbacks to induce the referral of prescriptions, defendants directed the marketing company to falsely represent that the marketing company would be paid on an "hourly" basis. But in fact the marketers were paid a percentage of the reimbursements the pharmacy received per prescription minus the cost of the medication. |

|   |   |   |
|---|---|---|
| | o. | The marketers likewise purposely did not tell the beneficiaries the names of the prescribing doctors-whom they often did not know-to increase the likelihood that the beneficiaries would agree to accept the medication. |
| | p. | In total, defendants and their co-conspirators caused the submission of false and fraudulent claims to health care benefit programs for prescriptions procured through the health care fraud and kickback scheme totaling over $4.6 million. |

<u>Overt Acts of the Conspiracy</u>

14. In furtherance of the conspiracy, the following overt acts were committed by defendants and others, within the Southern District of California, and elsewhere:

  a. On or about January 12, 2017, defendant CINDY JUSTICE as President of PureScience Rx, signed an information form for the pharmacy to become a Participating Pharmacy in the Humana healthcare network, which would allow PureScience Rx to seek reimbursement for dispensing prescriptions to beneficiaries whose benefits were covered by Medicare Part D.

  b. On or about January 12, 2017, defendant CINDY JUSTICE, as President of PureScience Rx, certified that PureScience Rx would ensure that employees responsible for delivery of Medicare Part D services received effective training to detect, correct and prevent fraud, waste, and abuse, including training that reviewed significant federal fraud waste and abuse laws, including the False Claims Act and the Anti-Kickback Statue.

     c.    On or about May 30, 2019, defendant CINDY JUSTICE, copying defendant ASHLEIGH DAVIS, emailed co-conspirator marketers asking them to submit hourly invoices for payment to PureScience Rx, to conceal the 50% kickback that PureScience Rx was paying in exchange for the referral of Medicare patients to the pharmacy.

     d.    On or about May 30, 2019, defendant CINDY JUSTICE copied defendant ASHLEIGH DAVIS on an email in which JUSTICE included a calculation of the profit to PureScience Rx for several prescription medications. JUSTICE included on her list 180 Vancomycin Hydrochloride 250 mg capsules, which cost PureScience Rx $530.91 but resulted in payment of $5,286.78, a profit of 89.9%.

     e.    On or about July 1, 2019, defendant CINDY JUSTICE emailed representatives of a so-called marketing company, advising them, "I have a large inventory for foot baths. I would like to move some product this week."

     f.    On or about February 27, 2020, defendant ASHLEIGH DAVIS sent a spreadsheet calculating commissions owed to several "marketers," copying JUSTICE, and explaining that PureScience Rx would not pay the sales commission of $20,318.77, calculated as 40% of the net profit, but instead would pay the lower amount of $20,125.00, due to the "fluctuation [between] the actual numbers paid by insurance and the hourly equivalents."

     g.    On or about April 3, 2020, PureScience Rx paid a marketing company $27,500 in exchange for referrals of Medicare patients for PureScience's "foot bath" medications.

9

h. On or about May 13, 2020, defendant ASHLEIGH DAVIS ran a "test claim" to determine the reimbursement for a medication called Daptomycin from a Part D plan sponsor.

i. On or about May 13, 2020, defendant ASHLEIGH DAVIS suggested that Daptomycin be used in lieu of Vancomycin in the foot bath prescriptions with that Part D plan sponsor, because the new medication reimbursed at a higher rate.

j. On or about May 14, 2020, defendant ASHLEIGH DAVIS proposed that Vancomycin be used with a different Part D plan sponsor, because "the margins are better."

k. In or about July 2020, PureScience Rx billed Medicare Part D $641,840.68 for Daptomycin.

l. In or about July 2020, PureScience Rx billed Medicare Part D a total of $1,403,020.80 for medically unnecessary and untested prescription medications.

m. On or about June 4, 2020, PureScience Rx paid a marketing company $71,250 in exchange for referrals of Medicare patients for PureScience's "foot bath" medications.

n. On or about August 4, 2020, PureScience Rx paid a marketing company $10,125 in exchange for referrals of Medicare patients for PureScience's "foot bath" medications.

o. On or about August 4, 2020, PureScience Rx paid a marketing company $119,000 in exchange for referrals of Medicare patients for PureScience's "foot bath" medications.

All in violation of Title 18, United States Code, Section 371.

**Counts 2 through 16**
Health Care Fraud
(18 U.S.C. § 1347)

15. Paragraphs 1 through 9 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

16. Beginning no later than in or about 2018 and continuing through at least August 2020, within the Southern District of California and elsewhere, defendants CINDY JUSTICE and ASHLEIGH DAVIS knowingly and willfully devised and intended to devise a material scheme and artifice to defraud Medicare, a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of, and payment for, health care benefits and services.

17. Paragraphs 10 through 14 of this Indictment are realleged and incorporated by reference as more fully describing defendants' scheme to defraud.

18. On or about the dates set forth below, within the Southern District of California and elsewhere, defendants CINDY JUSTICE and ASHLEIGH DAVIS knowingly and willfully executed the scheme to defraud described above by submitting, and causing to be submitted, a claim for reimbursement from Medicare, for the following beneficiaries, for the following items, in the following amounts, with each claim constituting a separate count:

//
//
//

11

| Count | Date of claim | Name of beneficiary | Claim | Claim Amount |
|---|---|---|---|---|
| 2 | 3/13/20 | Willette F. | Vacomycin Hydrochloride (6/day for 30 days), Diflorasone Diacetate (240 gms for 30 days), Gentamicin Sulfate (900 gms for 30 days), Econazole Nitrate (850 gms for 30 days) | $5,662.89 |
| 3 | 3/15/20 | Harry L. | Vacomycin Hydrochloride (6/day for 30 days), Gentamicin Sulfate (900 gms for 30 days), Econazole Nitrate (850 gms for 30 days), Diflorasone Diacetate (240 gms for 30 days) | $6,168.89 |
| 4 | 3/15/20 | Peggy S. | Vacomycin Hydrochloride (6/day for 30 days), Gentamicin Sulfate (900 gms for 30 days), Econazole Nitrate (850 gms for 30 days), Diflorasone Diacetate (240 gms for 30 days) | $6,168.98 |
| 5 | 3/20/20 | Joseph D. | Vacomycin Hydrochloride (6/day for 30 days), Gentamicin Sulfate (900 gms for 30 days), Econazole Nitrate (850 gms for 30 days) | $3,749.30 |
| 6 | 3/21/20 | Lurella T. | Vacomycin Hydrochloride (6/day for 30 days), Gentamicin Sulfate (900 gms for 30 days), Econazole Nitrate (850 gms for 30 days) | $3,749.30 |
| 7 | 4/7/20 | Margaret A. | Vacomycin Hydrochloride (6/day for 30 days), Gentamicin Sulfate (900 gms for 30 days), Econazole Nitrate (850 gms for 30 days), Diflorasone Diacetate (240 gms for 20 days) | $6,163.69 |
| 8 | 4/24/20 – 5/12/20 | Triena B. | Vacomycin Hydrochloride (6/day for 30 days), Gentamicin Sulfate (900 gms for 30 days), Diflorasone Diacetate (240 gms for 20 days), Econazole Nitrate (850 gms for 30 days), Diflorasone Diacetate (240 gms for 20 days) | $9,997.73 |

| Count | Date of claim | Name of beneficiary | Claim | Claim Amount |
|---|---|---|---|---|
| 9 | 5/1/20 | John W. | Diflorasone Diacetate (240 gms for 30 days), Econazole Nitrate (350 gms for 30 days), Gentamicin Sulfate (900 gms for 30 days), Vancomycin Hydrochloride (6/day for 30 days) | $6,969.91 |
| 10 | 5/6/20 | Shelia W. | Vancomycin Hydrochloride (6/day for 30 days), Diflorasone Diacetate (240 gms for 30 days), Econazole Nitrate (850 gms for 30 days), Gentamicin Sulfate (900 gms for 30 days) | $7,218.11 |
| 11 | 5/21/20 | Shereya S. | Gentamicin Sulfate (900 gms for 30 days), Econazole Nitrate (850 gms for 30 days), Vancomycin Hydrochloride (6/day for 30 days) | $3,509.90 |
| 12 | 6/2/20 | Lynn G. | Vancomycin Hydrochoride (6/day for 30 days), Gentamicin Sulfate (900 gms for 30 days), and Econazole Nitrate (850 gms for 30 days) | $3,077.90 |
| 13 | 7/17/20 | Dianne B. | Diflorasone Diacetate (240 gms for 20 days), Daptomycin (30), Econazole Nitrate (850 gms for 30 days), Gentamicin Sulfate (900 gms for 30 days) | $12,405.71 |
| 14 | 7/30/20 | Deborah H. | Diflorasone Diacetate (240 gms for 30 days), Daptomycin (30), Econazole Nitrate (850 gms for 30 days), Gentamicin Sulfate (900 gms for 30 days) | $11,356.47 |
| 15 | 8/5/20 | Walter P. | Daptomycin (30), Econazole Nitrate (850 gms for 30 days), Gentamicin Sulfate (900 gms for 30 days), Diflorasone Diacetate (240 gms for 20 days) | $11,356.47 |
| 16 | 8/6/20 | Brenda M. | Daptomycin (30), Econazole Nitrate (850 gms for 30 days), Gentamicin Sulfate (900 gms for 30 days), Diflorasone Diacetate (240 gms for 20 days) | $11,351.27 |

13

**Counts 17 through 25**
Payment of Illegal Remuneration
(42 U.S.C. § 1320a-7b(b)(2)(A))

19. Paragraphs 1 through 21 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

20. Beginning in or about 2017 and continuing through at least August 2020, within the Southern District of California, and elsewhere, defendants CINDY JUSTICE and ASHLEIGH DAVIS did knowingly and willfully offer to pay and did pay remuneration directly and indirectly, overtly and covertly, in cash and in kind, to persons to induce them to refer individuals to PureScience Rx for the furnishing and arranging for the furnishing of prescription pharmaceuticals, payment for which was made in whole and in part under a federal health care program, namely, Medicare, each payment forming a separate count:

| Count | Date | Payee | Amount |
|---|---|---|---|
| 17 | 4/3/20 | Midwest Medical | $27,500 |
| 18 | 4/20/20 | Midwest Medical | $17,125 |
| 19 | 5/5/20 | Midwest Medical | $33,125 |
| 20 | 5/19/20 | Midwest Medical | $44,250 |
| 21 | 6/4/20 | Midwest Medical | $71,250 |
| 22 | 6/19/20 | Midwest Medical | $29,875 |
| 23 | 7/6/20 | Midwest Medical | $32,750 |
| 24 | 7/17/20 | Midwest Medical | $36,750 |
| 25 | 8/4/20 | Midwest Medical | $10,125 |

All in violation of Title 42, U.S.C. Section 1320a-7b(b)(2)(A).

Forfeiture Notice
(U.S.C. § 982(a)(7))

21. Paragraphs 1 through 9 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture.

22. Upon conviction of any of the felony offenses alleged in Counts 1 through 25 of this Indictment and pursuant to Title 18, United States Code, Section 982(a)(7), and Rule 32.2, Federal Rules of Criminal Procedure, defendants CINDY JUSTICE and ASHLEIGH DAVIS shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

23. If, as a result of any act or omission of defendants CINDY JUSTICE and ASHLEIGH DAVIS any of the above-described forfeited property, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty,

//
//
//
//
//
//
//
//

15

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable herein by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the property described above subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(7).

DATED: June 12, 2024.

TARA K. McGRATH
United States Attorney

By: /s/ Valerie H. Chu
VALERIE H. CHU
Assistant U.S. Attorney